**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

CHERYL COX,

                        Plaintiff,

        -against-

THE CITY OF ROCHESTER, DAKOTA
VANBREDERODE,

                     Defendants.

---

22-cv-6207 (FPG)(MJP)

**PLAINTIFF'S**
**COUNTERSTATEMENT OF**
**UNDISPUTED FACTS PURSUANT**
**TO RULE 56.1**

<br>

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

## <u>TABLE OF CONTENTS</u>

Table of Contents .................................................................................................................. i

Table of Authorities ............................................................................................................. ii

PRELIMINARY STATEMENT............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

RELEVANT LAW.................................................................................................................. 2

ARGUMENT........................................................................................................................... 2

I. TAZ WAS SEIZED WHEN OFFICER VANBREDERODE SHOT HIM .............................. 2

II. VANBREDERODE'S SEIZURE OF TAZ WAS UNREASONABLE ................................... 4

    A. *Strong v. Perrone* demonstrates the seizure was unreasonable ...................................... 4

    B. *Cabisca v. City of Rochester* demonstrates the seizure was unreasonable ................... 7

    C. *Aljoe v. Adams* Demonstrates the Seizure Was Unreasonable ...................................... 8

III. PLAINTIFF'S NOTICE OF CLAIM WAS SUFFICIENTLY PLED ..................................11

    A. Plaintiff's notice of claim sufficiently detailed her trespass to chattel and conversion
       claims .............................................................................................................. 11

    B. Plaintiff can prove her state law claims as Defendants misstate the legal standard ......12

         1.  The Correct Legal Standard for Intent in Conversion and Trespass to Chattels
            …………………………………………………………………………….12

         2.  Officer Vanbrederode's Intentional Act of Shooting Taz Meets the Legal
            Standard…………………………………………………………………..13

         3.  Defendants' Argument Misinterprets the Legal Requirements for State Law
            Claims…………………………………………………….……………..….13

IV. OFFICER VANBREDERODE IS NOT ENTITLED TO QUALIFIED IMMUNITY.......... 14

V. THE *MONELL* CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE
   JURY ............................................................................................................................15

    A. Defendants' Motion to Dismiss Plaintiff's Municipal Liability Claims under Monell
       Must Be Denied Due to Non-Compliance with Rule 56.1 ......................................... 15

B. *Monell* liability may be found even if the officers are granted immunity.................16

C. The evidence demonstrates the RPD's "shoot first" policy is unconstitutional......... 16

D. A jury must decide if the City was deliberately indifferent to the RPD shooting residents' dogs .......................................................................................................... 19

   1. Whether the City failed to properly train its officers is a jury question..............19

      i. *Dr. Crosby's expert report demonstrates the City's training was grossly insufficient*………………………………………………………...……20

   2. Whether the City failed to properly supervise and discipline its officers for shooting dogs is a jury question ....................................................................... 22

      *i.*   *This theory was adequately pled.* ………………………………...22

      ii. *There is sufficient evidence to go to the jury*……..………………………23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Aljoe v. Adams,*
    No. 18-cv-01043, 2020 WL 12188842 (W.D.N.Y. Nov. 5, 2020) ...............................8-11

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 255 (1986) ...................................................................................10

*Askins v. Doe,*
    727 F.3d 248, 253-54 (2d Cir. 2013) ..................................................................16

*Baez v. New York City Housing Authority,*
    182 A.D.2d 554 (2 Dept 1992)...........................................................................12

*Barrett v. Orange County Human Rights Comm'n,*
    194 F.3d 341, 350 (2d Cir. 1999)........................................................................16

*Bateman v. Driggett,*
    2012 WL 2564839 (E.D. Mich. July 2, 2012) .....................................................3

*Buckeye Pipeline Co. v. Congel-Hazard, Inc.,*
    41 A.D.2d 590, 593 (4 Dept 1973)............................................................. 12-14

*Cabisca v. City of Rochester,*
    No. 14-cv-6485, 2019 WL 5691897 (W.D.N.Y. Nov. 4, 2019)………………………..7-8

*Carroll v. County of Monroe,*
    712 F.3d 649, 651 (2d Cir. 2013) .................................................................4, 15

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 322 (1986) ................................................................................. 2

*City of Canton v. Harris,*
    489 U.S. 378, 388, 390 (1989).........................................................................19

*Connick v. Thompson,*
    563 U.S. 51, 61, 131 S.Ct 1350, 179 L.Ed.2d 417 (2011) ...............................19

*Hayes v. New York City Dep't of Corr.,*
    84 F.3d 614, 619 (2d Cir. 1996) ....................................................................... 2

*Hunte v. Rushmore Loan Management Services LLC,*
　　No. 22-CV-2169, 2023 WL 2504734 (S.D.N.Y. Mar. 14, 2023)...................................... 15

*Johnson v. City of Shelby, Miss.,*
　　135 S. Ct. 346, 347 (2014).................................................................................................22

*Jones v. City of New York,*
　　2016 WL 1322443 (S.D.N.Y. 2016)...................................................................................19

*Level 3 Communications, LLC v. Petrillo Contracting, Inc.,*
　　31 A.D.3d 1100, 1102 (2d Dept 2010)...................................................................12-13, 14

*Meli v. City of Burlington,*
　　585 F. Supp. 3d 615, 643-45 (D. Vt. 2022).......................................................................17

*Mendez v. Cty. of Los Angeles,*
　　897 F.3d 1067, 1076 (9th Cir. 2018) ..................................................................................14

*Pangburn v. Culbertson,*
　　200 F.3d 65, 71-72 (2d Cir. 1999).......................................................................................16

*Phillips v. Girdich,*
　　408 F.3d 124, 130 (2d Cir. 2005)........................................................................................23

*Ringel v. County of Nassau,*
　　No. 18-CV-4221, 2021 WL 2117183 (E.D.N.Y. May 25, 2021) .....................................15

*Saucier v. Katz,*
　　533 U.S. 194, 201 (2001)....................................................................................................14

*SCR Joint Venture L.P. v. Warshawsky,*
　　559 F.3d 133, 137 (2d Cir. 2009) .........................................................................................2

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*
　　391 F.3d 77, 83 (2d Cir. 2004) .............................................................................................2

*Se Dae Yang v. New York City Health and Hospitals Corp.,*
　　35 N.Y.S.3d 350, 351 (2 Dept 2016) .................................................................................11

*Segal v. City of New York,*
　　459 F.3d 207 (2d Cir. 2006)...............................................................................................16

*Shea v. Inc. Vil. of Head of the Harbor,*
　　180 A.D.2d 675, 676 (2d Dept. 1992) ...............................................................................11

*Shimburski v. McCarthy,*

iv

No. 17-CV-699S, 2020 WL 5653298 (W.D.N.Y. Sept. 23, 2020) ................................2-4

*Sorlucco v. New York City Police Dep't,*
   971 F.2d 864, 870 (2d Cir. 1992).....................................................................................16

*Strong v. Perrone,*
   No. 17-CV-6183-FPG, 2020 WL 1445877 (W.D.N.Y. Mar. 25, 2020) ..................4, 7, 11

**Statutes and Rules**

42 U.S.C. § 1983 ....................................................................................................16, 17, 23

Fed. R. Civ. P. 56(c)....................................................................................................2, 15

General Municipal Law § 50-e…………………...............................................................11

Local Rule 56.1(a)……………………...........................................................................15, 16

## PRELIMINARY STATEMENT

Plaintiff Cheryl Cox respectfully submits this memorandum of law in opposition to Defendants' motion for summary judgment. This case arises from the unjustified shooting of Ms. Cox's beloved dog, Taz, by Rochester Police Department (RPD) Officer Dakota Vanbrederode on February 10, 2021. The evidence demonstrates that there are genuine disputes of material fact that preclude summary judgment on Ms. Cox's claims for unlawful seizure of property, conversion/trespass to chattels, and municipal liability.

The record shows that Officer Vanbrederode acted unreasonably when he shot Taz, who posed no objective threat. Vanbrederode failed to follow proper procedures to ensure Taz remained secured inside, despite expressing concern the dog would get out. He then positioned himself on an enclosed porch with no escape route, and immediately resorted to lethal force when Taz exited the house, without attempting less-lethal options. This conduct violated clearly established law.

Moreover, substantial evidence demonstrates the City's "shoot first" policy of permitting officers to immediately resort to lethal force, despite no imminent threat and when non-lethal options are available. Substantial evidence also shows the City's deliberate indifference to the need for proper training, supervision and discipline regarding dog encounters. The City provided only minimal training that fell well below accepted standards, failed to implement free Department of Justice training resources, and never disciplined officers for improper shootings. As in other cases across the country, this led to an unacceptably high number of dog shootings by RPD officers.

For these reasons, and as detailed below, Defendants' motion for summary judgment should be denied in its entirety. Ms. Cox's claims warrant a full and fair trial before a jury.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to her Rule 56.1 Statement of Undisputed Facts for a

more detailed recitation of the evidence that she maintains warrants denial of the City's motion.

## RELEVANT LAW

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 83 (2d Cir. 2004). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr*., 84 F.3d 614, 619 (2d Cir. 1996).

## ARGUMENT

## II.    TAZ WAS SEIZED WHEN OFFICER VANBREDERODE SHOT HIM

Contrary to Defendants' assertion, the shooting of Taz constituted a seizure under the Fourth Amendment, even though it was non-fatal. The core issue is not whether the dog was killed, but whether there was a meaningful interference with the owner's possessory interest. The Western District of New York addressed this very issue in *Shimburski v. McCarthy* and found that wounding a dog can indeed constitute a seizure.

In *Shimburski*, the court declined to dismiss a seizure claim based on the wounding of a dog, reasoning that "the shooting and severe injury of a pet pit bull 'was [a] meaningful interference with [plaintiff's] possessory interests in his pet dog.'" (*Shimburski v. McCarthy*, No. 17-CV-699S, 2020 WL 5653298, at *8 (W.D.N.Y. Sept. 23, 2020), quoting *Bateman v. Driggett*, 2012 WL 2564839, at *7 (E.D. Mich. July 2, 2012)). The court further held that "[w]hether the Fourth Amendment is violated in wounding [the dog] then turns on whether the shooting was reasonable under the circumstances." (Id.) This legal principle is applicable here as well.

Here, Taz suffered a serious gunshot wound that required emergency surgery, a circumstance that undeniably constitutes a significant interference with Ms. Cox's possessory interest in her property. (¶ 25)[1]. The shooting led to ongoing behavioral changes in Taz, (¶ 26), further demonstrating a meaningful interference with Ms. Cox's ability to use and enjoy her property. Moreover, Ms. Cox incurred significant veterinary bills and her porch was damaged and needs to be repaired. (¶¶ 27-28). Under these circumstances, a reasonable jury could find that the shooting constituted a seizure.

Defendants argue that the non-fatal shooting of Taz does not constitute a seizure, but this contradicts the reasoning in *Shimburski*, which focuses on the extent of interference with the owner's possessory interest rather than the dog's death. The relevant issue is whether there was a meaningful interference with the owner's rights, not whether the dog was killed.

Moreover, adopting Defendants' position would simply be unjust as whether someone like Ms. Cox could bring claims depends solely on whether their beloved family pet was killed rather than wounded when shot. This outcome is contrary to the Fourth Amendment, which protects against unreasonable seizures, including those of personal property such as companion animals.

---

[1] All "¶" citations are to Plaintiff's Rule 56.1 Counterstatement of Facts.

The decision in *Strong v. Perrone* further supports this argument. In *Strong*, the court denied summary judgment on a seizure claim where a dog was shot by a police officer, holding that the shooting constituted a seizure because it represented a "severe intrusion given the emotional attachment between a dog and an owner" (*Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *4 (W.D.N.Y. Mar. 25, 2020), citing *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013)). This reasoning is directly applicable here, as Taz's wounding caused a significant disruption to Ms. Cox's possessory rights and emotional bond.

Finally, the principles established in *Shimburski* and *Strong* are consistent with the broader Fourth Amendment jurisprudence, which focuses on the reasonableness of the officer's conduct under the totality of the circumstances. The Defendants' argument that a non-fatal shooting does not constitute a seizure fails to account for this established legal framework.

In sum, consistent with *Shimburski* and the fundamental principles of Fourth Amendment jurisprudence, the shooting of Taz constituted a seizure. The Court should reject Defendants' argument on this point and allow the seizure claim to proceed to a determination of whether the seizure was reasonable under the totality of the circumstances. The evidence presented, when viewed in the light most favorable to the Plaintiff, clearly shows that the wounding of Taz was an unreasonable seizure under the Fourth Amendment. The City's motion for summary judgment should therefore be denied.

## III.   VANBREDERODE'S SEIZURE OF TAZ WAS UNREASONABLE

### A.   *Strong v. Perrone* demonstrates the seizure was unreasonable.

In *Strong v. Perrone*, the court denied summary judgment on a Fourth Amendment seizure claim, finding that the shooting of a dog by a police officer could constitute an unreasonable seizure (*Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25,

2020)). The court emphasized that the reasonableness of the officer's actions must be assessed based on the totality of the circumstances, including whether the officer had a realistic opportunity to use non-lethal means before resorting to deadly force. In *Strong*, Officer Perrone shot a dog named Sheba inside a home after the dog allegedly charged at him. The court found that there were factual disputes about whether the dog actually posed a threat, whether the officer had time to consider non-lethal options, and whether his entry into the home was lawful (id. at *2-*3). These factors contributed to the court's decision to allow the case to proceed to trial.

Similarly, in the present case, Officer Vanbrederode shot Plaintiff Cheryl Cox's dog, Taz, under circumstances where he had foreknowledge of the dog's presence and behavior. Unlike in *Strong*, where there was ambiguity about the officer's entry into the home and the immediacy of the threat posed by the dog, Officer Vanbrederode knew of Taz's presence, heard the dog barking aggressively, and had time to formulate a plan to avoid a lethal encounter. Despite this foreknowledge, Officer Vanbrederode failed to employ any non-lethal measures or position himself in a way that would minimize the need for deadly force. Instead, he chose to secrete himself on a confined porch with no escape route, increasing the likelihood of a deadly encounter. This conduct was not only avoidable but also contrary to prudent police practice, as acknowledged in his own statements recorded on his body-worn camera.

Moreover, in *Strong*, the court noted that a reasonable jury could find that the officer's conduct was unreasonable due to the emotional attachment between an owner and a dog, which is a significant factor under the Fourth Amendment (id. at *3). Here, Cheryl Cox had a similar bond with her dog, Taz, making the intrusion on her possessory interest severe.

In this case, as in *Strong*, the shooting of Taz occurred on an enclosed front porch, a location similarly protected under the Fourth Amendment. However, the circumstances here are

even more egregious than those in *Strong*. In *Strong*, the court focused on the unreasonable killing of the dog and the lack of immediate threat posed. In our case, the recklessness of Officer Vanbrederode's actions is amplified by the fact that Ms. Cox and other Rochester Police Department officers were present on or near the porch at the time of the shooting. This created a significant risk of harm not only to Taz but also to the individuals present, as stray bullets could have easily struck one of the humans on the scene.

Lieutenant Peter Nigrelli, the Rule 30(b)(6) witness designated to testify on behalf of the City of Buffalo, confirmed in his deposition that such an action would have violated the Buffalo Police Department's policies. Nigrelli testified that discharging a firearm in the presence of other people, as Officer Vanbrederode did, would violate Buffalo Police Department policy because of the inherent risk to human life (Nigrelli Deposition, pp. 34-35). This testimony underscores the recklessness of Vanbrederode's actions, as a responsible officer should have opted for non-lethal means or ensured that no bystanders were in the line of fire before using deadly force.

James Crosby's expert report further supports Nigrelli's opinion. Crosby notes that the shooting was particularly unreasonable because it is objectively unreasonable to fear suffering serious injury or death from a dog bite. Crosby emphasizes that "no single dog presents a plausible risk of fatality to an able-bodied adult accompanied by other humans. In fact, only a very few dogs of the very largest types can match the force potential of even an unarmed human" (Crosby Report, p. 19). This statement highlights the excessive nature of the force used by Officer Vanbrederode, who chose to use deadly force in a situation where the actual threat level was minimal.

Therefore, similar to *Strong*, where the court allowed the case to proceed to trial due to the unreasonable nature of the officer's conduct, the facts here show that Officer Vanbrederode's use of deadly force against Taz was not only unreasonable but also reckless, given the risk to human

life and the availability of non-lethal alternatives. Given that Officer Vanbrederode had more time to prepare for and potentially de-escalate the situation than Officer Perrone did in *Strong*, the argument that his actions were unreasonable is even stronger. Thus, the facts here provide a compelling basis for denying summary judgment on the unlawful seizure claim, just as in *Strong*. The City's motion should be denied, and the question of whether Officer Vanbrederode's actions were reasonable under the totality of the circumstances should be presented to a jury.

      **B.**    ***Cabisca v. City of Rochester* demonstrates the seizure was unreasonable.**

The facts of this case also differ markedly from those in *Tina Cabisca v. City of Rochester*, where Judge Feldman dismissed the seizure claim—while acknowledging it was a "very close call" (*Cabisca v. City of Rochester*, No. 14-cv-6485, 2019 WL 5691897, at *4 (W.D.N.Y. Nov. 4, 2019)). In *Cabisca*, Investigator Nolan Wengert was caught off guard by the sudden appearance of a dog on the porch where he was knocking. The dog ran up the driveway and onto the enclosed porch without any prior warning, leaving Wengert with no opportunity to anticipate or prepare for the encounter. This forced him to make a split-second decision in a tense and rapidly evolving situation.

In contrast, the circumstances here are significantly different. Officer Vanbrederode was fully aware of Taz's presence from the outset, having heard the dog barking aggressively behind a door. Unlike in *Cabisca*, where the officer was unaware of the dog's presence and had no time to prepare, Officer Vanbrederode was in a position to anticipate the dog's potential escape and could have taken precautions to avoid using lethal force. The fact that he expected the dog might escape, as evidenced by his own comments captured on body-worn camera footage, further undermines the claim that he acted reasonably. Additionally, unlike Wengert in *Cabisca*, who was

caught in an unexpected confrontation, Vanbrederode deliberately positioned himself on the enclosed porch for no reason, which increased the likelihood of a lethal encounter.

Furthermore, in *Cabisca*, the court emphasized that the officer had no time to react and that the use of force was a difficult split-second decision. Here, Officer Vanbrederode had ample time to plan and choose a non-lethal response but failed to do so. This difference is critical because it demonstrates that Vanbrederode's use of force was not a result of a sudden, unexpected threat, but rather a foreseeable situation where he chose not to take reasonable steps to avoid shooting the dog. Given these distinctions, the court should find that the circumstances in this case warrant a different outcome than in *Cabisca*. The evidence here supports the conclusion that Officer Vanbrederode's actions were not justified under the circumstances, and the unlawful seizure claim should proceed to trial.

C.      *Aljoe v. Adams* **Demonstrates the Seizure Was Unreasonable**

The City's citation of *Aljoe v. Adams* to support their argument for summary judgment is misleading and does not fully represent the court's reasoning. In *Aljoe v. Adams*, the court denied summary judgment, finding there were genuine issues of material fact regarding whether the officer acted reasonably when shooting the plaintiff's dog (*Aljoe v. Adams*, No. 18-cv-01043, 2020 WL 12188842, at *3-5 (W.D.N.Y. Nov. 5, 2020)). The City attempts to narrow the decision to a single factual dispute—whether the dog was stationary or advancing when shot—but this overlooks the broader analysis conducted by the court.

Importantly, the court's analysis in *Aljoe* went beyond the simple question of whether the dog was stationary or advancing. The court considered multiple factors that are directly relevant to the present case, illustrating that the reasonableness of the officer's actions must be assessed under the totality of the circumstances:

1. **Context of the Encounter**: The court found it relevant that the dog was inside the plaintiffs' home, rather than "running free in public," which strengthened the plaintiffs' possessory interest and weakened the government's interest in public safety (*Aljoe*, 2020 WL 12188842, at *5). Similarly, Taz was within the confines of Ms. Cox's property when he was shot by Officer Vanbrederode. This context is crucial because it affects the perceived threat level and the appropriateness of using deadly force.

2. **Officers' Prior Knowledge**: The *Aljoe* court emphasized that the officers were aware of the dog's presence before entering, based on informant reports and the raid planning questionnaire (*Id.*). While in *Aljoe* the prior knowledge was based on reports and formal planning, here, Officer Vanbrederode became immediately aware of Taz's presence upon arrival, as he could hear the dog barking from within the home. This foreknowledge provided Vanbrederode with an opportunity to consider and prepare for a potential encounter with the dog, an opportunity that he failed to utilize responsibly.

3. **Credibility Issues**: The court noted that there was a significant factual dispute based on the plaintiff's testimony that he observed the dog "cowering" and "scared," which conflicted materially with the officers' version of events (*Id.* at *6). The court held that this presented "a question of credibility that is inappropriate for resolution by summary judgment" (*Id.*). Similarly, in this case, Ms. Cox's testimony about Taz's behavior, describing the dog as non-threatening, wagging his tail, and not charging aggressively, conflicts with Officer Vanbrederode's account. This creates a credibility issue that should be evaluated by a jury, not resolved through summary judgment.

4. **Reasonableness of Force**: The *Aljoe* court questioned the reasonableness of shooting the dog a second time when it was already "laying down," even if the officer feared it might "pop back up" (*Id.* at *7). This analysis mirrors the issues raised by Officer Vanbrederode's decision to shoot Taz multiple times, particularly when Taz was already injured and not posing an active threat. The reasonableness of each shot fired is a factual question that cannot be resolved without a full assessment of the evidence.

5. **Non-Lethal Alternatives**: The court found it significant that the officer had "less lethal options" available, such as pepper spray and a Taser, but did not provide any explanation for why he failed to use them (*Id.*). Similarly, Officer Vanbrederode had access to non-lethal options but chose not to employ them, opting instead for immediate lethal force. This failure to consider or deploy less harmful means is directly relevant to the reasonableness of his actions under the Fourth Amendment.

Officer Vanbrederode's body-worn camera footage reveals that he anticipated the dog might escape, yet he positioned himself on a confined porch with no clear exit strategy. This conduct was particularly reckless given that Officer Vanbrederode and other officers had ample time to plan for a non-lethal resolution, unlike in *Aljoe*, where the officer's encounter with the dog

was sudden and unexpected (*Id.* at *3*). The *Aljoe* court emphasized that the reasonableness of the officer's actions could not be determined as a matter of law when there were unresolved questions about whether the officer could have safely avoided using deadly force (*Id.* at *4*).

Crucially, the *Aljoe* court underscored that summary judgment is "improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial" (*Id.* at *4*, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The court recognized that while a jury might ultimately find the officer's actions reasonable, the totality of the circumstances raised sufficient questions of fact to preclude summary judgment.

The parallels between *Aljoe* and this case are striking. As in *Aljoe*, the totality of the circumstances here—including the home setting, prior knowledge of the dog, conflicting testimony creating credibility issues, questions about the necessity of lethal force, and the failure to use non-lethal alternatives—raise genuine disputes of material fact that must be resolved by a jury. The City's attempt to distinguish *Aljoe* is unavailing, and the case actually provides strong support for denying summary judgment on Ms. Cox's unreasonable seizure claim.

Moreover, the question of whether Officer Vanbrederode's use of force was reasonable under the circumstances is fundamentally a question of fact that requires credibility determinations and a weighing of the evidence (*Id.* at *4-5*). This is especially true given that Officer Vanbrederode's actions created a substantial risk not only to Taz but also to the individuals present on the porch, including Ms. Cox and other officers. The fact that bullets could have easily struck a human bystander further underscores the unreasonableness of the seizure.

In conclusion, the City's reliance on a narrow reading of *Aljoe v. Adams* is misplaced. The court in *Aljoe* denied summary judgment based on a comprehensive analysis of the totality of the circumstances and multiple unresolved factual disputes, not merely a single point of contention.

The same reasoning applies here: given the numerous factual and credibility issues regarding Officer Vanbrederode's actions and decisions, the Court should deny Defendants' motion for summary judgment on the unlawful seizure claim. The evidence, when viewed in the light most favorable to the Plaintiff, clearly shows that a jury could find Officer Vanbrederode's actions were unreasonable under the Fourth Amendment.

By properly analyzing *Strong v. Perrone*, *Tina Cabisca v. City of Rochester*, and *Ajole v Adams*, it is clear that Officer Vanbrederode's actions were less reasonable than the officers in those cases, thereby justifying the denial of summary judgment in this case.

## IV.   PLAINTIFF'S NOTICE OF CLAIM WAS SUFFICIENTLY PLED

### A. Plaintiff's notice of claim sufficiently detailed the her trespass to chattel and conversion claims.

General Municipal Law § 50-e does not "require that a claimant state a precise cause of action *in haec verba* in a notice of claim." S*e Dae Yang v. New York City Health and Hospitals Corp.*, 35 N.Y.S.3d 350, 351 (2 Dept 2016). The purpose of a notice of claim is to enable a municipality to investigate and assess the merits of the claim. *Shea v. Inc. Vil. of Head of the Harbor*, 180 A.D.2d 675, 676 (2 Dept 1992).

Ms. Cox's notice of claim sufficiently detailed her claims regarding the shooting of Taz by Officer Vanbrederode. It alleged that the City and its employees were negligent in "assaulting; destroying property; in intentionally inflicting mental, emotional harm upon the claimant; in negligently inflicting mental, emotional harm upon the claimants; in negligently, carelessly and recklessly hiring, training and/or supervising the aforementioned Police Officers." The notice described the incident as "a classic case of a police officer shooting a dog without lawful purpose or justification" and detailed the resulting damages.

This language was sufficiently broad to encompass Ms. Cox's claims regarding Officer Vanbrederode's improper handling of the encounter with her dog. Defendants have not demonstrated any prejudice from the alleged lack of specificity, particularly given that the incident was recorded on body-worn cameras and the City's policies regarding dog encounters have not changed since the incident. *See Baez v. New York City Housing Authority*, 182 A.D.2d 554 (2 Dept 1992).

**B.  Plaintiff can prove her state law claims as Defendants misstate the legal standard.**

Defendants incorrectly argue that Plaintiff cannot prove her state law claims for conversion and trespass to chattels because Officer Vanbrederode did not "intend" to interfere with Ms. Cox's possessory interest in her dog, Taz. This argument misinterprets the legal standard for intent in the context of these claims under New York law. The focus is on the intentional act—here, the shooting of Taz—not on the specific intent to dispossess or damage the property.

**1.  The Correct Legal Standard for Intent in Conversion and Trespass to Chattels**

Under New York law, both conversion and trespass to chattels require that the defendant committed an intentional act that resulted in interference with the plaintiff's possessory rights. Intent in this context does not mean that the defendant must have intended the specific harm or the interference itself; it is sufficient that the defendant intended the act that caused the interference. As articulated in *Buckeye Pipeline Co. v. Congel-Hazard, Inc.*, the intent necessary for trespass to chattels is satisfied when a defendant acts with knowledge that damage to the property is substantially certain to result from their conduct. *Buckeye Pipeline Co. v. Congel-Hazard, Inc.*, 41 A.D.2d 590, 593 (4 Dept 1973).

Similarly, in *Level 3 Communications, LLC v. Petrillo Contracting, Inc.*, the court held that a defendant could be liable for trespass to chattels when they intentionally performed an act that

caused damage to the plaintiff's property, regardless of whether they intended to cause that specific damage. *Level 3 Communications, LLC v. Petrillo Contracting, Inc.*, 31 A.D.3d 1100, 1102 (2d Dept 2010).

**2. Officer Vanbrederode's Intentional Act of Shooting Taz Meets the Legal Standard.**

In this case, Officer Vanbrederode's intentional act of shooting Taz is sufficient to satisfy the intent element for both conversion and trespass to chattels. There is no dispute that Officer Vanbrederode intentionally fired his weapon, which resulted in Taz's injury. Under the established legal standard, the relevant intent is the intent to perform the act—the shooting—that led to the interference with Ms. Cox's property rights, not an intent to cause harm or to interfere with the property specifically.

Defendants' focus on the lack of specific intent to interfere with Ms. Cox's possessory interest is a misstatement of the law. The requirement of intent is fulfilled when the defendant engages in an intentional act that is substantially certain to cause harm to the property, as is evident from the principles laid out in *Buckeye Pipeline* and *Level 3 Communications*. Officer Vanbrederode's act of shooting Taz, knowing that injury to the dog was substantially certain to result, satisfies this requirement.

**3. Defendants' Argument Misinterprets the Legal Requirements for State Law Claims**

By focusing on the intentional nature of the shooting itself, Plaintiff has established the requisite intent for both conversion and trespass to chattels under New York law. The Defendants' argument that Plaintiff must show Officer Vanbrederode specifically intended to interfere with Ms. Cox's property rights misconstrues the applicable legal standard. Instead, it is sufficient that

13

the officer performed an intentional act (shooting the dog) with the knowledge that such an act was substantially certain to interfere with Ms. Cox's possessory rights in Taz.

Accordingly, the Court should reject Defendants' argument and deny summary judgment on Plaintiff's state law claims for conversion and trespass to chattels. The evidence clearly supports that Officer Vanbrederode's intentional act of shooting Taz meets the legal standard for intent required to prove these claims. The Plaintiff has presented sufficient evidence for a jury to find that the shooting of Taz was an unlawful interference with her possessory interest under state law.

## V.      OFFICER VANBREDERODE IS NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity does not apply where (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Both prongs are satisfied here.

As discussed above, a reasonable jury could find Vanbrederode's actions violated Ms. Cox's Fourth Amendment rights. Moreover, the right at issue was clearly established in February 2021. The Second Circuit held in 2013 that the unreasonable killing of a companion animal violates the Fourth Amendment. Carroll, 712 F.3d at 651. While Carroll involved a fatal shooting, it was clearly established that using unreasonable force against a dog violates the Constitution.

The fact that Taz survived does not entitle Vanbrederode to qualified immunity. His actions in shooting Taz multiple times at close range could have easily been fatal. He cannot escape liability simply because his aim was poor or Taz was fortunate enough to survive. *See Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018) (denying qualified immunity where officer's shots missed fleeing suspect).

Given the clearly established law and the evidence of unreasonable conduct, qualified immunity is inappropriate. The reasonableness of Vanbrederode's actions is a question for the jury.

## VI.   THE *MONELL* CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY

### A.   Defendants' Motion to Dismiss Plaintiff's Municipal Liability Claims under Monell Must Be Denied Due to Non-Compliance with Rule 56.1

Defendants' motion for summary judgment on Plaintiff's *Monell* claims should be denied due to non-compliance with Local Rule 56.1 and Fed. R. Civ. P. 56. Defendants failed to include any facts in their Rule 56.1 Statement to support their assertion that "there is no genuine issue to be tried" concerning Plaintiff's *Monell* claims, as required by both Local Rule 56.1(a) and Fed. R. Civ. P. 56(c)(1).

Local Rule 56.1(a) mandates a "separate, short, and concise statement" of material facts for which there is no genuine issue. Fed. R. Civ. P. 56(c)(1) similarly requires citation to specific parts of the record or a showing that materials cited do not establish a genuine dispute. By omitting any facts related to Plaintiff's *Monell* claims in their statement, Defendants have failed to meet these requirements.

Courts in this Circuit have consistently denied summary judgment motions when the moving party fails to provide a proper Rule 56.1 statement. In *Hunte v. Rushmore Loan Management Services LLC*, No. 22-CV-2169, 2023 WL 2504734 (S.D.N.Y. Mar. 14, 2023), the court denied a motion for summary judgment because the defendant failed to file a proper Rule 56.1 statement that complied with Local Rule 56.1, which is necessary to streamline consideration of the motion and avoid forcing the court to search the record for undisputed facts. Similarly, in *Ringel v. County of Nassau*, No. 18-CV-4221, 2021 WL 2117183 (E.D.N.Y. May 25, 2021), the court denied a summary judgment motion where the moving party's 56.1 statement was deficient, emphasizing that compliance with Local Rule 56.1 is essential to determining whether there is any genuine issue of material fact to be tried.

Defendants' failure to include any material facts related to the *Monell* claims demonstrates they have not shown the absence of a genuine issue for trial as required by Rule 56. Therefore, their motion should be denied.

**B.      *Monell* liability may be found even if the officers are granted immunity.**

Contrary to Defendants' assertion, Monell liability may be imposed even if the individual officers are found not liable due to qualified immunity. The Second Circuit has clearly held that "a municipality may be held liable for deprivations of constitutional rights under § 1983 even when no individual defendant is found personally liable." *Askins v. Doe*, 727 F.3d 248, 253-54 (2d Cir. 2013). This principle has been consistently reaffirmed. S*ee Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). The case cited by Defendants, *Segal v. City of New York*, 459 F.3d 207 (2d Cir. 2006), predates Askins and does not reflect current Second Circuit law on this issue. Therefore, even if Officer Vanbrederode is granted qualified immunity, the City may still be held liable for its unconstitutional policies and practices regarding dog encounters.

**C.  The evidence demonstrates the RPD's "shoot first" policy is unconstitutional.**

The City's argument that its policy regarding use of force against dogs is facially constitutional misses the point. Ms. Cox has presented substantial evidence of an unwritten custom or policy of permitting officers to shoot dogs with alarming frequency, without sufficient justification, in situations where non-lethal alternatives are available and effective.

As the Second Circuit has held, § 1983 liability can attach to a municipality for a practice, as opposed to an official policy, authorized by an official with policy-making responsibility. *Pangburn v. Culbertson*, 200 F.3d 65, 71–72 (2d Cir.1999). It can also attach to a practice established by subordinate employees, if there is constructive acquiescence by senior policy-making officials. *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992).

Importantly, "As noted in *Meli v. City of Burlington*, expert testimony is not required to show deficiencies in municipal policies or practices when there is sufficient evidence for a jury to infer the existence of a custom or practice. 585 F. Supp. 3d 615, 643-45 (D. Vt. 2022). Here, the evidence is sufficient without any expert testimony based on the firearm discharge reports, the number of shootings between 2004 and 2009 and 2013 to 2021, and the testimony of the numerous RPD officers, the testimony of the City of Buffalo's Rule 30(b)(6) witness Peter Nigrelli, and the testimony of the City of Rochester's Rule 30(b)(6) witness Michael Cuilla.

The statistics paint a disturbing picture. Between 2004 and 2009, RPD officers shot at 87 dogs, killing 35. (¶ 29). Between 2013 and 2018, they killed approximately 50 dogs, averaging nearly one dog per month. (¶ 30). As Dr. Crosby details in his expert report, between 2014 and 2022, RPD officers shot and killed at least 66 pet dogs (Ex 17, Crosby Report, p. 7). This averages to nearly one dog killed per month over an 8-year period.

Yet during this time, no RPD officer was ever disciplined or required to undergo additional training for shooting a dog (¶ 62). This pattern persisted despite clear examples of unreasonable force, like the August 2019 incident where an officer shot a dog that was not advancing or attacking (¶¶ 83-90). The failure to address such incidents through discipline or retraining reflects a de facto policy of permitting unnecessary shootings.

Moreover, the City's written policies instruct officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective (¶¶ 31-36). This directly contradicts manufacturer guidance and accepted best practices (¶¶ 31-34; Ex 17, Crosby Report, pp. 17-18). Since 2003, TASER has informed all departments that, based on an analysis of 37 incident reports involving animals (mostly dogs), there was a 92% success rate. (Ex 13, TASER Animal

Certification). Nevertheless, the City explicitly instructs its TASER-certified officers to ignore this training and to instead shoot dogs. (¶¶ 35-36)

This TASER policy is a clear example of the RPD's "shoot first" policy—or its broader custom or policy that permits and even encourages the use of lethal force against dogs, even when there is no imminent threat and effective non-lethal alternatives are available. By instructing officers to disregard TASER training and manufacturer guidance, the RPD is effectively sanctioning the unnecessary use of deadly force against animals. This policy demonstrates a systemic disregard for the constitutional protections against unreasonable seizures, as it prioritizes lethal force over readily available and highly effective non-lethal alternatives.

Furthermore, this policy is indicative of a larger pattern of deliberate indifference to the rights of pet owners and the lives of their animals. By explicitly directing officers to use firearms instead of TASERs, even when TASERs have been proven effective, the RPD is creating a de facto policy that treats all dog encounters as situations warranting lethal force. This blanket approach fails to account for the specific circumstances of each encounter and ignores the Fourth Amendment's requirement that seizures be reasonable. The fact that the RPD maintains this policy despite clear evidence of the effectiveness of non-lethal alternatives suggests a conscious choice to prioritize lethal force, further supporting the existence of an unconstitutional custom or policy regarding dog shootings.

Dr. Crosby's expert report provides substantial evidence of the RPD's shoot first policy. Crucially, Dr. Crosby discusses the City's shoot first policy of instructing officers to use lethal force against dogs even when non-lethal tools like TASERs are available and effective. He specifically cites Michael Cuilla's testimony that the RPD directs its Taser-certified officers to ignore TASER training about the use of non-lethal measures and instead to shoot dogs with their

firearms (Ex 17, Crosby Report, pp. 15-16). Dr. Crosby emphatically states that this directive "is

a violation of good and accepted best practices" (Ex 17, Crosby Report, p. 16).

> **D.      A jury must decide if the City was deliberately indifferent to the RPD shooting residents' dogs.**
>
> > **1.   Whether the City failed to properly train its officers is a jury question.**

There is substantial evidence to support Plaintiff's claim that the City is liable under a

deliberate indifference, failure to train theory of municipal liability. Courts in the Second Circuit

have articulated the elements of deliberate indifference for such a claim as follows:

> (1) a policymaker knows to a moral certainty that [his] employees
> will confront a given situation; (2) the plaintiff must show that the
> situation either presents the employee with a difficult choice of the
> sort that training or supervision will make less difficult or that there
> is a history of employees mishandling the situation; and (3) the
> wrong choice by the city employee will frequently cause the
> deprivation of a citizen's constitutional rights.

*Jones v. City of New York*, 2016 WL 1322443 at *8 (S.D.N.Y. 2016)).

Deliberate indifference may therefore be found where "city policy makers are on actual or

constructive notice that a particular omission in their training program causes city employees to

violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179

L.Ed.2d 417 (2011). Notice is generally established by alleging a pattern of similar violations;

however, "in a narrow range of circumstances, a pattern of similar violations might not be

necessary to show deliberate indifference," *id*. at 63, 131 S.Ct. 1350 (internal quotation marks

omitted), such as where "the need for more or different training is so obvious, and the inadequacy

so likely to result in the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489

U.S. 378, 388, 390 (1989).

>    ***i.  Dr. Crosby's expert report demonstrates the City's training was grossly insufficient.***

The City argues that it provided proper training to its officers through a 2014 in-service session developed by Reno DiDomenico, a former Monroe County Sheriff's Deputy. However, the expert report of James Crosby, Ph.D., demonstrates that this training was grossly inadequate both in duration and content. According to DiDomenico's own testimony, the training was a brief 1.5 to 2-hour session, which is insufficient to properly educate officers on the complexities of canine behavior and how to handle encounters with dogs without resorting to lethal force. (¶¶ 46-49) The training lacked hands-on practice or interactive components necessary for officers to internalize the techniques being taught. Instead, it provided only a basic overview, which was inadequate for ensuring that officers could effectively apply these techniques in real-life situations (Ex 17, Crosby Report pp. 14-15).

Moreover, DiDomenico, who developed and delivered the training, lacks the necessary expertise in dog behavior, a critical component for creating an effective program. Dr. Crosby emphasizes that DiDomenico is not a certified dog trainer or animal behaviorist, and his background does not equip him to develop a comprehensive training program on this subject. The limited involvement of animal behavior expert Robert Lockwood did not extend to the core training provided to the officers. This reliance on inadequately qualified individuals underscores the insufficiency of the training provided by the City (Ex 17 Crosby Report, p. 16).

Dr. Crosby also criticizes the City for not utilizing readily available, comprehensive training resources that could have significantly improved officer preparedness. Specifically, the U.S. Department of Justice's Community Oriented Policing Services (COPS) program offers detailed materials and videos on how to handle dog encounters (Exs. 22-26) yet the City chose not to incorporate these resources into their training program. Crosby notes that these resources are

available at no cost and are specifically designed to prevent unnecessary harm to dogs during police encounters (Ex 17, Crosby Report, pp. 18-19).

In addition to the deficiencies in the content and structure of the training, Dr. Crosby reviewed deposition testimonies from approximately 20 RPD officers, revealing a striking lack of recollection regarding the details of the training they received on dog encounters (¶¶ 54-57). Many officers could not remember specifics about the non-lethal options supposedly covered in the training. (Id.) For instance, while some officers recalled discussions about using a baton, they could not confirm whether they were trained on the use of OC spray or other non-lethal methods. (Id.) This lack of retention suggests that the training was not sufficiently impactful or comprehensive to be effective (Ex 17, Crosby Report, pp. 22-23).

The inadequacy of the training is further evidenced by the alarming number of dog shootings by RPD officers. Between 2014 and 2022, RPD officers shot and killed at least 66 pet dogs. This pattern indicates that the training provided was not only insufficient but also failed to instill the necessary skills and knowledge to prevent these tragic incidents. Dr. Crosby compares this with other police departments, such as Buffalo, which, after implementing proper training, saw a significant reduction in dog shootings. For example, after Buffalo implemented a department-wide training in 2014, the number of dogs shot by police dropped by 62%, from 26 in 2013 to just 10 in 2017 (Ex 17, Crosby Report, pp. 25-26).

In 2014, the Buffalo Police Department took a proactive step in addressing the issue of dog shootings by providing all of its officers with the free COPS training developed by the U.S. Department of Justice's Community Oriented Policing Services (COPS) program. (¶ 125) This training was delivered during a mandatory, day-long, in-service session and included a series of videos specifically designed to educate officers on how to handle encounters with dogs safely and

effectively. (Id.) The training materials emphasized the importance of understanding canine behavior and applying non-lethal methods to manage situations involving dogs.

The implementation of this training had a significant and immediate impact. The number of dogs shot by Buffalo police officers dropped dramatically. (¶ 126) Specifically, the number of dog shootings decreased by 62%, from 26 incidents in 2013 to just 10 in 2017 (Crosby Report, pp. 25-26). This reduction is a clear indication of the training's effectiveness in reducing unnecessary harm to dogs during police operations.

Lieutenant Peter Nigrelli of the Buffalo Police Department testified that the training was indeed mandatory for all officers and that it played a critical role in changing how officers approached encounters with dogs. (See Ex 45). He noted that since the implementation of the training in 2014, the Buffalo Police Department saw a marked decrease in the number of dogs shot by officers, particularly during SWAT operations. He attributed this positive change directly to the comprehensive nature of the COPS training, which provided officers with the necessary tools and knowledge to handle dog encounters more safely (Ex 45 22:1-23:2). This testimony underscores the effectiveness of the DOJ training and highlights the RPD's failure to adopt similar, readily available, and proven methods to prevent unnecessary shootings of dogs.

**2. Whether the City failed to properly supervise and discipline its officers for shooting dogs a jury question.**

*i.   This theory was adequately pled.*

The theory was clearly adequately pled in the complaint. *See*, *Johnson v. City of Shelby, Miss.,* 135 S. Ct. 346, 347 (2014) (although § 1983 not pled, defendants were advised of the factual basis of the claim, and plaintiffs were "required to do no more"; amendment must be allowed to assert § 1983). If the factual allegations support a valid claim, the court must treat the complaint

as raising that claim, even if the plaintiff has not cited the right legal theory. *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005).

### ii.   There is sufficient evidence to go to the jury.

No RPD officer has ever been disciplined or required to undergo additional training for shooting a dog. (¶ 62). This is despite the long history of troubling dog shootings by RPD officers. The evidence reveals a systemic failure by the RPD to supervise or discipline its officers in incidents involving the shooting of dogs. This lack of accountability has contributed to a culture where officers feel free to use lethal force against dogs without fear of repercussions.

The only person required to review an incident where an officer fires a gun at a dog is the officer's immediate supervisor, normally a sergeant. (¶¶ 63-64). The Professional Standards Section (the RPD's internal affairs), is not required to review incidents where firearms are discharged at dogs. (¶¶ 64-65).

The RPD has not changed any of its training on canine encounters in response to prior incidents where officers have shot dogs (¶ 66). The City also has not made any recommendations for changes in its policies or training regarding the use of force against dogs after reviewing BWC of dog shootings (¶67). The City does track the number of dogs shot by its officers, but it does not conduct any statistical analysis of this data or generate reports on it, unless specifically requested to do so (¶ 68).

Commander Fabian Rivera testified that during his tenure at the RPD, no officers were disciplined or required to undergo retraining as a result of shooting a dog. (¶ 128) He mentioned that although he knew of four or five officers that had shot dogs, none were disciplined, though some were ridiculed for missing their shots. (Id.) Specifically, Chief Rivera referenced an incident involving Officers Mike Johnson and Korey McNees, who were ridiculed for missing shots at a

small dog, but they did not face any disciplinary actions (¶ 128-129). Rivera also confirmed that there was no record of disciplinary actions taken against officers Nellist and Kelly in this case. (¶ 130).

Similarly, Aaron Springer testified that, to his knowledge, no officer within the RPD has ever been disciplined or required to undergo retraining specifically as a result of shooting a dog. (¶ 131) Springer was unaware of any measures taken to reduce the number of dogs shot while he was with the RPD, other than a training bulletin with various "aggressive" dog postures. (¶ 132) Springer does not remember any other specific trainings during his time with the RPD from 1996 to 2020 regarding how to safely interact with dogs. (¶ 133 ) The RPD trains officers that if a dog is running at them and they perceive the dog to be an imminent threat, then they can shoot the dog. (¶ 134) However, the RPD does not provide specific training to officers to determine if the dog objectively poses and imminent threat.

This is particularly concerning, as numerous officers have shot multiple dogs. For example, former RPD Sgt. Daniel Zimmerman testified that he shot approximately 25 dogs during his time as an officer with the RPD. (¶ 69) He stated that these shootings occurred between 1988 and 2009, particularly during his time in the narcotics division before 2010. Zimmerman mentioned that after the last time he shot a dog, there was no retraining or disciplinary action taken against him. Furthermore, he noted that the RPD did not provide any training regarding interactions with dogs during police duty during his tenure (Id.).

On August 11, 2019, Officer Kenneth Pinkney shot a dog on Cedarwood Terrace. As detailed by Pinckney at his deposition, he shot the dog while it was standing on the grassy area between the sidewalk and the curb (¶ 85). The dog had previously retreated to its yard but then turned and barked at Pinckney and another officer while in an "assertive, dominant position" (Id.).

The dog had not advanced towards the officers or left the curb before Pinckney fired his shotgun (Id.) Pinckney clearly violated RPD policy, as the dog was not advancing or attacking in any way. Yet Pinckney was not disciplined or required to undergo any additional training as a result of the incident.

Dr. Crosby emphasizes that effective supervision and discipline are critical components of maintaining good and accepted police practices. The absence of these elements in the RPD's response to dog shootings indicates a systemic failure of accountability within the department. This failure is particularly egregious given the availability of comprehensive training resources that could have been implemented to prevent such incidents. (Ex 17, Crosby rpt. 11-16).

This lack of supervision and discipline underscores the City's failure to supervise its officers and reflects a deliberate indifference to the constitutional rights of residents and their pets.

The City's claim that it has adequately supervised and disciplined its officers is not supported by the evidence. Instead, the City's inaction in the face of repeated dog shootings demonstrates a clear failure to hold officers accountable, thereby perpetuating a pattern of unconstitutional behavior. This lack of accountability directly contradicts the City's assertion and highlights the need for significant reforms within the RPD to address these systemic issues.

## **CONCLUSION**

For all of the reasons stated herein, Plaintiff respectfully submits the Court should deny the City's motion for partial summary judgment in its entirety.

Dated: August 26, 2024               Roth & Roth, LLP
        New York, New York

                                ~//s//~
                          Elliot Dolby Shields